# STATE OF LOUISIANA

## COURT OF APPEAL

*JMW*

## FIRST CIRCUIT

\* \* \* \* \* \* \*

*JPS*

## 2023 CJ 1269

## STATE OF LOUISIANA
## IN THE INTEREST OF S.F. AND R.B.

JUDGMENT RENDERED: **APR 1 9 2024**

\* \* \* \* \* \* \*

Appealed from the Juvenile Court
Twenty-Second Judicial District • Parish of Washington • State of Louisiana
Docket Numbers J-22-31 and J-22-57

The Honorable Scott Gardner • Presiding Judge

\* \* \* \* \* \* \*

| | |
|---|---|
| Douglas Lee Harville<br>*Contract Attorney for the*<br>*Louisiana Public Defender Board,*<br>*Child in Need of Care Appellate Project*<br>Shreveport, Louisiana<br>    *and*<br>John T. Thomas<br>Franklinton, Louisiana | COUNSEL FOR APPELLANT<br>MINORS' MOTHER—L.F. |
| Rebecca F. Henderson<br>*Mental Health Advocacy Service (MHAS),*<br>*Child Advocacy Program*<br>Mandeville, Louisiana | COUNSEL FOR APPELLEES<br>MINOR CHILDREN—S.F. and R.B. |
| Kimberly E. DeBrock<br>Covington, Louisiana | COUNSEL FOR APPELLEE<br>The Louisiana Department of<br>Children and Family Services<br>(DCFS) |

\* \* \* \* \* \* \*

**BEFORE: WELCH, WOLFE, AND STROMBERG, JJ.**

*EW Wolfe, J. concurs without reasons.*

**WELCH, J.**

The mother of two minor children appeals a judgment that terminated her parental rights and freed her two minor children for adoption.[1] For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

L.F. is the biological mother of S.F. (born August 19, 2018) and R.B. (born February 1, 2022). L.F. and the children's father, K.B.,[2] have a history of domestic violence, substance abuse, and mental health issues. The Louisiana Department of Children and Family Services ("DCFS") became involved with the family and opened an investigation due to R.B.'s birth as a drug-affected newborn.[3] When R.B. was born, she was premature, in respiratory distress, and tested positive for THC, methamphetamines, and amphetamines. Throughout the investigation, L.F. and K.B. were cooperative with DCFS and showed a willingness to do whatever necessary for the two minor children to remain in the home. L.F. admitted to using THC and Xanax during the investigation, as well as chronically using THC to self-medicate her bipolar disorder. Due to the children's ages and vulnerability, an initial safety plan was put in place with the children's paternal grandparents[4] designated as safety monitors who would check in with the family multiple times throughout the day.

---

[1] The same August 9, 2023 judgment terminated the father's (K.B.'s) parental rights as well; however, the father has not appealed. The judgment is final as it relates to the termination of the father's parental rights. See **State in Interest of A.B.**, 2023-0655 (La. App. 1st Cir. 1/19/24), ___ So.3d ___, ___ n.2, 2024 WL 205495, *1 n.2, writ denied, 2024-00221 (La. 3/7/24), ___ So.3d ___, 2024 WL 1066953.

[2] K.B. is listed as the father on R.B.'s birth certificate, but not on S.F.'s birth certificate. The State of Louisiana, Department of Health's putative father registry indicated that no one is registered as the putative father of either child. The Twenty-Second Judicial District Clerk of Court's Office and the Twenty-First Judicial District Clerk of Court's Office indicates that no one has filed any act of acknowledgment as it relates to either child. However, through the Child in Need of Care ("CINC") proceedings, K.B. admitted that he was the father of both minor children.

[3] This matter began as a CINC without custody case, which was assigned docket number J-22-31.

[4] The children's paternal grandparents are S.B. and R.B.

2

On February 21, 2022, DCFS[5] made referrals for substance abuse treatment, mental health treatment, and parenting education classes.[6] L.F. was recommended for participation in Family Preservation Court ("FPC"),[7] with outpatient level of care supported by random drug screens, attendance of recovery support groups, and completion of individual and couple's treatment to address codependency, domestic abuse, and recovery. L.F. was also recommended for parenting classes and clinical treatment for her mental health needs.[8]

A Family Team Meeting was held on April 5, 2022.[9] DCFS discovered that L.F. was non-compliant with her treatment since her initial assessment on March 25, 2022, and had not followed up on referrals for parenting classes and mental health services. L.F. also failed to attend her FPC orientation.

DCFS developed and finalized a case plan on April 5, 2022 that set forth the basic requirements for each parent to maintain custody of S.F. and R.B. The case plan required L.F. to ensure that the home environment was safe, stable, and healthy;

---

[5] Lydia Godbolt was the DCFS caseworker (and Family Services worker) assigned to this matter.

[6] This program within DCFS is called "Family Services," which are social services provided to families and children in their own homes in order to address problems of abuse/neglect and promote the safety of the children within the family unit for a time-limited period, generally six months. See Department of Children & Family Services, Child Welfare, "Family Services," https://www.dcfs.louisiana.gov/page/112 (last accessed March 18, 2024).

[7] The Twenty-Second Judicial District Court's FPC is a special program designed to help parents recover from substance abuse by participating in treatment, frequent drug testing, and monthly judicial monitoring. See "Family Preservation Court," https://online.22ndjdc.org/family-preservation-court (last accessed March 18, 2024).

[8] Chris Russell with TRUTH 180 assessed L.F. on March 25, 2022. TRUTH 180 serves St. Tammany and Washington Parishes by providing individual, group, and family therapy to all those mandated by the courts or other entities to receive these services. See "Clinical Adult Services," https://truth180.org/ (last accessed March 18, 2024).

[9] "Family Team Meetings bring together a family and interested people, like friends, neighbors and community members, with resources from child welfare, mental health, schools, and other helping agencies. These interested parties work together to learn what the family hopes to accomplish, set realistic and important goals, recognize and encourage the family's strengths, identify what the family needs, find solutions that build on the family's strengths and lead to necessary changes, make a plan for who will do what and when it will be done, and agree on the next steps. The purpose of Family Team Meetings is to keep children safe, promote children's well-being, and support families." See Department of Children & Family Services, Child Welfare, "Family Team Meetings," https://www.dcfs.louisiana.gov/page/365 (last accessed March 18, 2024).

3

complete substance abuse assessment and treatment—including submitting to random drug screens and attending recovery support groups; complete individual and couple's treatment for domestic abuse; cooperate with DCFS for home visits and telephone calls; complete a mental health assessment and follow any recommendations made; and not engage in domestic violence. The case plan also required L.F. to attend parenting classes.

During home visits in April and early May 2022, DCFS reported that L.F. had failed to follow up with any of her treatment recommendations and failed to complete her FPC orientation. L.F. failed to contact any of her treatment supervisors or respond to their efforts to communicate with her. DCFS stressed to L.F. the importance of complying with the case plan, remaining clean and sober, and following up with her treatment recommendations. After L.F. finally completed FPC orientation in mid-May 2022, FPC representatives reported to DCFS that L.F. was more interested in the children's father's role with treatment than in her own treatment. On May 18, 2022, TRUTH 180 reported that L.F. failed to attend treatment and failed to take a scheduled drug test. At a juvenile court hearing on May 20, 2022, DCFS stressed the importance of L.F.'s compliance with all of her recommended treatment, otherwise the children could enter DCFS custody. Likewise, at L.F.'s first FPC hearing on May 26, 2022, the court stressed to L.F. that if she did not comply with her case plan, the children would be placed in DCFS custody. After the FPC hearing, L.F. met with DCFS workers, who recommended that she submit to a drug test that day, make an appointment with her mental health provider, make an appointment with her primary care doctor to evaluate a newly-observed leg injury, and schedule a substance abuse treatment session.

The next day—May 27, 2022—DCFS confirmed that L.F. failed to comply with any of the previously-recommended treatment or the April 5, 2022 case plan. L.F. admitted to using methamphetamines and smoking marijuana, which is why she

4

refused to take a drug test the previous day. DCFS indicated that the paternal grandparents had previously asked to be relieved of their duty as safety monitors because there was turmoil between them and L.F. When law enforcement conducted a welfare check on L.F. and K.B.'s home, officers discovered the "filthy" children wearing dirty clothes and found the home in disarray with clothes and trash spread throughout.

Due to the children's ages, vulnerability level, and risk of harm, the State took S.F. and R.B. into custody on May 27, 2022 by instanter order and placed the children in the care of their paternal grandparents. In the affidavit in support of the instanter order, the DCFS caseworker stated that L.F. had a history with the agency—she was investigated in 2015 for dependency and lack of supervision of two older children. During that case, L.F. moved to Mississippi, where Mississippi's child protective services agency ultimately removed those two older children from her care, and she has never regained custody of them. DCFS also stated that both parents had extensive criminal histories and a history of domestic violence.

The juvenile court adjudicated the children in need of care on June 13, 2022, pursuant to stipulations by the parents without admissions to the supporting allegations.

After another Family Team Meeting, DCFS developed and finalized a case plan on June 24, 2022 that set forth the basic requirements for each parent to achieve the goal of reunifying the children with them.[10] The case plan required L.F. to maintain stable housing and provide a safe and nurturing home for her children; comply with substance abuse treatment; address her mental health issues; maintain contact with DCFS and be open and honest; and complete the RENEW program. The case plan also required L.F. and K.B. to "pay a total of $20.00 in child support

---

[10] The juvenile court approved the June 24, 2022 case plan in an order signed on July 29, 2022.

for their children[.]" The DCFS caseworker later testified that L.F. and K.B. were obligated to pay $20.00 per month, per child ($40.00 total) in child support. The case plan further required L.F. and K.B. to apprise DCFS of their whereabouts and circumstances. DCFS indicated the children were placed with their paternal grandparents, with whom the children were bonded, and who provided the most appropriate and least restrictive family-like setting for the children.

In August 2022, DCFS reported that the caseworker had been unable to assess L.F.'s home in the previous three months. DCFS also indicated that L.F. had not maintained contact with DCFS or kept the agency informed of her whereabouts and circumstances, nor had she made any child support contribution payments. DCFS reported that despite having twenty-four opportunities to visit her children, L.F. had only visited five times.

DCFS reported that L.F. was discharged from FPC for non-compliance. On August 17, 2022, L.F. tested positive for amphetamines and methamphetamines. After a September 9, 2022 meeting with DCFS, where she was confronted with her lack of participation in her case plan, lack of visitation with her children, and lack of understanding of what was required of her, L.F. stated that she had no money for the $7.00 drug tests or gas to attend visitations. DCFS informed her that if she would have maintained regular contact with DCFS, the agency would have attempted to provide her with transportation. While L.F. did complete parenting classes, DCFS noted that she had not visited her children consistently enough to exhibit what she had learned. DCFS completed an application on behalf of L.F. to secure her a place in the sober living home, Grace House; however, L.F. did not check in to Grace House.

DCFS developed and finalized a case plan on October 26, 2022 that set forth the continuing requirements for each parent to achieve the goal of reunifying the

children with them.[11] The case plan again required L.F. to maintain stable housing and provide a safe and nurturing home for her children; comply with substance abuse treatment; address her mental health issues; and maintain contact with DCFS and be open and honest. The case plan also required L.F. and K.B. to "pay a total of $20.00 in child support for their children[.]" The DCFS caseworker later testified that L.F. and K.B. were obligated to pay $20.00 per month, per child ($40.00 total) in child support. The case plan further required L.F. and K.B. to apprise DCFS of their whereabouts and circumstances.

In February 2023, DCFS reported that L.F. completed substance abuse and mental health treatment at Fontainebleau Treatment Center on January 11, 2023. There, she was diagnosed with cannabis dependence, stimulant abuse, post-traumatic stress disorder, low body mass index, and nicotine dependence. L.F. was referred for follow-up treatment with Bogalusa Behavioral Health Clinic and TRUTH 180, but DCFS could not verify that L.F. attended any follow-up treatment. L.F. was readmitted to FPC in January 2023; however, she missed her FPC hearing on January 19, 2023. Since her discharge from treatment at Fontainebleau, DCFS indicated that L.F. participated in two visits with the children. At these visits, L.F. relied on the caretaker's diaper bag to change and feed R.B. DCFS encouraged L.F. to bring her own diaper bag and supplies. DCFS stated that while L.F. had maintained contact with her DCFS caseworker since her treatment, she had not made her home available for DCFS to inspect. L.F. had not made any parental contribution payments.

DCFS developed and finalized a case plan on February 1, 2023 that set forth the same continuing requirements for each parent to achieve the goal of reunifying

---

[11] The juvenile court approved the October 26, 2022 case plan in an order signed on December 19, 2022.

the children with them.[12] The case plan again required L.F. to maintain stable housing and provide a safe and nurturing home for her children; comply with substance abuse treatment; address her mental health issues; and maintain contact with DCFS and be open and honest. The case plan also required L.F. and K.B. to "pay a total of $20.00 in child support for their children[.]" The DCFS caseworker later testified that L.F. and K.B. were obligated to pay $20.00 per month, per child ($40.00 total) in child support. The case plan further required L.F. and K.B. to apprise DCFS of their whereabouts and circumstances.

In April 2023, DCFS reported that L.F. attended a mental health services appointment at Bogalusa Behavioral Health Clinic on February 23, 2023, where medical providers recommended she engage in medical management services, attend a psychiatric appointment, and obtain a new primary care doctor. L.F. underwent a psychological evaluation on February 10, 2023 at the Washington Parish DCFS office with Dr. Rafael Salcedo. Dr. Salcedo diagnosed L.F. with anxiety, depression, and personality disorder with paranoid and anti-social traits. Dr. Salcedo recommended that L.F. be closely monitored since she was taking multiple psychotropic medications. He suggested that L.F. could benefit from continued substance abuse treatment as well as cognitive behavioral psychotherapy to address unresolved issues from her childhood causing her depression and anxiety.

DCFS noted that since first becoming involved with this case, L.F. had resided with K.B. in the family home in Mount Hermon; however, as of April 2023, DCFS reported that K.B. was three to four months behind on rent payments and that the family was due to be evicted. L.F. told DCFS that she was recently hired at Winn-Dixie; however, she did not provide proof of income or documentation to verify her employment. DCFS further indicated that L.F. had not made any parental

---

[12] The juvenile court approved the February 1, 2023 case plan in an order signed on March 1, 2023.

contribution payments. DCFS reported that L.F. did not confirm a scheduled visit nor did she actually visit her children during February 2023. In March 2023, L.F. tested positive for THC and methamphetamines after a random hair drug test. However, her urine drug test was negative, and she denied any drug use.

DCFS developed and finalized a case plan on April 4, 2023, which changed the permanency goal for the children from reunification with the parents to the new stated goal of adoption.[13] The case plan indicated that the paternal grandparents had become certified and agreed to adopt the children if the rights of the parents were terminated. The case plan stated that the home of the paternal grandparents was the most appropriate and least restrictive family-like setting for the children. The case plan required L.F. to maintain stable housing and provide a safe and nurturing home for her children; comply with substance abuse treatment; address her mental health issues; and maintain contact with DCFS and be open and honest. The case plan also required L.F. and K.B. to "pay a total of $20.00 in child support for their children[.]" The DCFS caseworker later testified that L.F. and K.B. were obligated to pay $20.00 per month, per child ($40.00 total) in child support. The case plan further required L.F. and K.B. to apprise DCFS of their whereabouts and circumstances.

On June 20, 2023, DCFS filed a petition to terminate the parental rights of L.F. and K.B. and certify the children for adoption.[14] DCFS alleged two grounds for the termination of L.F.'s parental rights. First, DCFS alleged that L.F.'s parental rights should be terminated pursuant to La. Ch. Code art. 1015(5)(b),[15] for failing "to provide significant contributions to the child[ren]'s care and support for any

---

[13] The juvenile court approved the April 1, 2023 case plan in an order signed on May 11, 2023.

[14] The petition to terminate parental rights was assigned docket number J-22-57.

[15] The juvenile court decided this matter under the prior version of La. Ch. Code art. 1015, before its amendment by 2023 La. Acts No. 271, § 1 (eff. June 9, 2023). The amendment renumbered La. Ch. Code art. 1015(5)(b) to La. Ch. Code art. 1015(4)(b); the substance of this subsection of the statute has not changed.

period of six consecutive months" (one of the "abandonment" grounds for termination). DCFS claimed that L.F. (and K.B.) were required to pay $20.00 per month, per child ($40.00 total) in child support, but L.F. (and K.B.) had made no payments since the initial date of custody, May 27, 2022. Second, DCFS alleged that L.F.'s parental rights should be terminated pursuant to La. Ch. Code art. 1015(6),[16] for her failure to substantially comply with the case plans and there being "no reasonable expectation of significant improvement" in L.F.'s condition or conduct in the near future (the "substantial compliance with the case plan" ground for termination).[17]

The termination of parental rights hearing was held on August 4, 2023. Lydia Godbolt, the DCFS caseworker assigned to this matter, testified at the hearing. Regarding L.F.'s substance abuse, she indicated that L.F. was still participating in substance abuse treatment through FPC, at the phase two level (of four total phases), after eight months of participation in FPC. At the time of the termination hearing, L.F. had only been sober for approximately five months. Prior to January 2023, Ms. Godbolt stated that L.F. did not meaningfully participate in any kind of substance abuse treatment. Since readmission to FPC in January 2023, L.F.'s compliance with her substance abuse treatment did not become consistent until around April 2023. Prior to April 2023, Ms. Godbolt testified that L.F.'s drug test results continued to show stalled and diluted results, which did not demonstrate her consistent sobriety.

---

[16] As stated above in FN 15, 2023 La. Acts No. 271, § 1 (eff. June 9, 2023) renumbered La. Ch. Code art. 1015(6) to La. Ch. Code art. 1015(5); the substance of this subsection of the statute has not changed.

[17] The petition alleged that the father's (K.B.) parental rights should be terminated based on the same two grounds: (1) abandonment under La. Ch. Code art. 1015(5)(b) (failure to provide significant contributions to the children's care and support for any period of six consecutive months); and (2) substantial case plan compliance under La. Ch. Code art. 1015(6) (failure to substantially comply with the case plan and there being no reasonable expectation of significant improvement in the parent's condition or conduct). Since K.B. has not appealed the juvenile court's August 9, 2023 judgment, we will not detail the testimony adduced at the hearing on which the juvenile court based its decision to terminate K.B.'s parental rights.

Ms. Godbolt indicated that this concerned DCFS due to L.F.'s long history of substance abuse.

As to L.F.'s mental health treatment, Ms. Godbolt testified that L.F. received medication management through Bogalusa Behavioral Health Clinic. Ms. Godbolt reported that L.F. was compliant with her mental health treatment.

Ms. Godbolt testified that the case plans obligated L.F. (and K.B.) to pay $20.00 per month, per child ($40.00 total) in child support. Ms. Godbolt indicated that the parents had made only four parental contribution payments—dated June 14, 2022, August 5, 2022, May 5, 2023, and June 16, 2023—each in the amount of $10, for a total of $40.00. The exhibit introduced by DCFS during the hearing that lists the parental contribution payments appears to show that four payments of $10.00 each, per child, for a total of $40.00 per child ($80.00 total), were made; however, the exhibit does not indicate which parent made the payments.

Ms. Godbolt testified that after L.F. and K.B. were evicted from their home in Mount Hermon, they secured another place to live in Franklinton; however, they had not demonstrated the ability to maintain stable housing for a significant length of time. L.F. and K.B. had only resided at their current address in Franklinton for approximately five months at the time of the termination hearing.

From February 2022 to March 2023, DCFS was not provided with proof of employment for either parent. Ms. Godbolt testified that L.F. reported she had become employed at Winn-Dixie in March 2023; however, L.F. did not provide proof of income to DCFS until June 2023. Ms. Godbolt stated that L.F. had not produced a current pay stub for the past two months at the time of the termination hearing.

Regarding visitation, Ms. Godbolt stated that L.F. was scheduled for supervised visits with the children at the DCFS office; however, L.F. had not always maintained her visitation schedule. For example, the week of the termination

11

hearing, L.F. did not confirm or show for the scheduled visitation. Since the children were taken into DCFS custody on May 27, 2022, Ms. Godbolt testified that L.F. had only visited the children consistently for a period of approximately six months—February 2023 through August 2023 (until the missed visit prior to the termination hearing).

Ms. Godbolt testified that DCFS sought the termination of L.F.'s parental rights on the basis that she had not demonstrated that she was able to maintain sobriety over an extended period of time. Due to L.F.'s history of substance abuse, Ms. Godbolt indicated that DCFS would have wanted to see L.F. work her case plan and maintain her sobriety for much longer than six months before considering that L.F. was stable and sober. Furthermore, DCFS found that the children were placed in the care of their paternal grandparents where their needs were being met. Ms. Godbolt testified that the children were in a placement with relatives, who to the best of her knowledge were "not trying to completely take the children" away from L.F. As long as she remained sober, Ms. Godbolt believed that L.F. would be able to maintain a relationship with the children.

Although the children recognized L.F. and K.B. as their parents and had a bond with them, Ms. Godbolt testified that the children did not recognize their parents as their primary caregivers; the children identified their paternal grandparents as their primary caregivers. Ms. Godbolt stated that in her opinion, it would be detrimental to the children at this point in their lives to disrupt their placement since they had developed a strong bond with their paternal grandparents and had been placed in their home for over a year and a half. Ms. Godbolt stated that the children had been placed with their paternal grandparents since May 27, 2022 and were thriving daily. She reiterated that the grandparents were certified and willing to adopt S.F. and R.B. should the children be freed for adoption.

The Court Appointed Special Advocates ("CASA") volunteer assigned to the case, Claire McGuire, similarly acknowledged the children were "blossoming" and "comfortable" in their grandparents' care, where she believed they would continue to thrive. Ms. McGuire expressed concern as to the stability of any home the parents might provide; specifically, whether the children's home life and education would continue as is, with a caregiver able to sit and help the children reinforce at home what they learned in school. Ms. McGuire testified that during supervised visits with L.F. and K.B., she observed the parents play with the children, but not necessarily talk to them. She observed L.F. hold R.B. and sometimes read to her.

L.F. also testified at the termination hearing. Regarding proof of employment and income, L.F. stated that Winn-Dixie did not provide her with a paper or electronic pay stub, but that all of her employment information goes through her banking app, which she is unable to access on her phone. She confirmed that she did not willfully fail to provide proof of income or employment to DCFS. As to her mental health treatment, L.F. stated that she sees Dr. Maurine Ladner at Bogalusa Behavioral Health Clinic once every three months. She testified that she is prescribed and takes the following medication: Celexa, Caplyta, Amitriptyline, Buspar, and Klonopin. L.F. testified that she missed the last visitation immediately prior to the termination hearing because she had been under a lot of duress and stress due to working, the upcoming termination hearing, and the anniversary of her father's death. L.F. confirmed that she loved her children "more than life itself" and was absolutely dedicated to maintaining her sobriety and working the case plans.

At the conclusion of the hearing, the juvenile court granted DCFS's petition to terminate the parental rights of L.F. and K.B. The juvenile court found that DCFS proved the grounds for terminating their parental rights under La. Ch. Code art. 1015(5)(b) and La. Ch. Code art. 1015(6) by clear and convincing evidence. The juvenile court held:

[A]t least one year has elapsed since the [children were] removed, and there's been no substantial parental compliance with the case plan for services, which has been previously filed, and no reasonable expectations of any improvement in the parent's condition or conduct in the near future.

I do acknowledge that the parents have, perhaps, very much after they needed to, had some minimal compliance, and, in particular, they've demonstrated commitment to the court program for sobriety.

I find that reasonable efforts have been made by the department to prevent removal, reunite the family to achieve permanency, and to place the siblings together. I find that a need for permanence predominates, based upon the dates of custody, the goal change, and the date that the petition to terminate parental right[s] was filed.

I find that there is a strong caretaker-child bond, and the danger of removal to the long term-health and well-being of the two children, would be devastating. Both of these children have been in their grandparent[s'] care for much, if not all, of their lives. They know no other home. To remove them at this point, we know, based upon current science and these children's situation through the testimony, would be devastating to them.

I suspect even the parents know that. I find that it's in the best interest of the children.

The juvenile court thereafter issued written reasons, finding that DCFS proved two grounds for terminating L.F.'s parental rights—under La. Ch. Code art. 1015(5)(b), L.F. abandoned her children by failing to provide significant contributions to the children's care for a period of six consecutive months—and under La. Ch. Code art. 1015(6), for her failure to substantially comply with the case plans and there being "no reasonable expectation of significant improvement." The court noted that L.F. and K.B. only made four payments—two in 2022 and two in 2023, each for $10.00, and the last payment was made more than six months prior to the termination hearing. The juvenile court also stated that "the parents' attention to completing their Case Plan has been lacking even in the simplest and most critical for the protection of the children." The juvenile court further held that the

termination of L.F. and K.B.'s parental rights would be in the best interests of the children because of their "young age" and the "need for stability [that] adoption provides[.]" The court noted that the children "were placed with their paternal grandparents at the beginning of the case where they have remained. The CASA volunteer testified that they are thriving in that home. [R.B.] essentially has known no other family than her grandparents. The grandparents are committed to adopting the [c]hildren if they are freed [for adoption]." In accordance with those written reasons, the juvenile court signed a judgment of termination of parental rights and certification for adoption on August 9, 2023.

L.F. filed a motion for new trial.[18] DCFS filed an objection to L.F.'s motion for new trial. In an order signed on August 9, 2023, the juvenile court granted DCFS's objection and denied L.F.'s motion for new trial.[19] L.F. now appeals the August 9, 2023 judgment terminating her parental rights.[20]

---

[18] L.F.'s motion for new trial was accompanied by a proposed order requesting that the motion be set for hearing. See La. District Court Rules, Rule 9.8. Although the juvenile court set a contradictory hearing for September 21, 2023 on L.F.'s motion for new trial, based on the record, the juvenile court denied L.F.'s motion without holding a contradictory hearing. The juvenile court committed no error, as there is no absolute right to a contradictory hearing on a motion for a new trial. **Newman v. Chamber of Commerce of Kentwood**, 462 So.2d 299, 300 n.1 (La. App. 1st Cir. 1984), writ denied, 463 So.2d 1319 (La. 1985).

[19] After the record on appeal was lodged with this court, we issued a show cause order, noting that the juvenile court signed a ruling on August 9, 2023 relating to L.F.'s motion for new trial. It was "unclear from the ruling whether the Motion for New Trial was granted, *making this appeal premature*, or whether the Motion for New Trial was denied[.]" It is well settled in Louisiana law that an appeal taken while a timely motion for a new trial is pending is premature and subject to dismissal because the motion suspends the operation of the final judgment being appealed. See La. C.C.P. arts. 2087 and 2123; **Crescent Real Estate Equities/1100 Poydras v. Louisiana Tax Comm'n**, 2001-1434 (La. App. 1st Cir. 9/28/01), 809 So.2d 394, 396. In a response to the show cause order, L.F. filed a brief with this court, agreeing with our observation and requesting that we dismiss this matter as premature and remand to the juvenile court to issue an order granting or denying the motion for new trial. On February 7, 2024, this court issued an interim order, remanding this matter to the juvenile court for the limited purpose of instructing the juvenile court to sign an amended order granting or denying the motion for new trial. On February 16, 2024, the juvenile court signed an "Amended Order" stating that in response to L.F.'s motion for new trial, DCFS had filed an objection. The juvenile court indicated that its August 9, 2023 "Order" *granted* DCFS's objection and *denied* L.F.'s motion for new trial. The juvenile court supplemented the record on appeal with its amended order. After reviewing, we find that the amended order clarified and corrected the alleged deficiencies. Accordingly, we maintain this appeal.

[20] L.F. filed a motion for a suspensive appeal on September 25, 2023. The juvenile court signed an order of appeal on September 26, 2023, notice of which was transmitted by the clerk of court to the parties on September 26, 2023. In accordance with La. C.C.P. arts. 2127 and 2128, L.F. designated portions of the record to constitute the record on appeal. See Uniform Rules, Courts of

## LAW AND DISCUSSION

Termination of the legal relationship between natural parents and children is one of the most drastic actions the State can take against its citizens. **State in Interest of A.L.D.**, 2018-1271 (La. 1/30/19), 263 So.3d 860, 863. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. **State ex rel. J.A.**, 99-2905 (La. 1/12/00), 752 So.2d 806, 811. See also **State in Interest of A.B.**, 2024-00221 (La. 3/7/24), ___ So.3d ___, ___, 2024 WL 1066953, *1 (Chrichton, J., concurring). The interests of the parents and children must be balanced; however, the paramount consideration is the best interest of the children. **State in Interest of C.F.**, 2017-1054 (La. 12/6/17), 235 So.3d 1066, 1075. Thus, rather than simply protecting parental rights, our judicial system must protect the rights of children to thrive and survive in a safe, secure environment and to be reared by someone capable of caring for them. **Id**. To protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, the Louisiana Children's Code provides a judicial process for terminating the parents' rights and responsibilities and certifying the children for adoption. La. Ch. Code art. 1001.

Louisiana Children's Code article 1015 enumerates the grounds for the involuntary termination of parental rights. The State must prove the elements of at least one of the statutory grounds for termination by clear and convincing evidence. See La. Ch. Code art. 1035(A); **State in Interest of C.F.**, 235 So.3d at 1072. That is, the State must prove that the existence of the ground for termination is highly probable or much more probable than its nonexistence—more than proof by a preponderance of the evidence, but less than proof beyond a reasonable doubt. **In re L.M.M., Jr.**, 2017-1988 (La. 6/27/18), 319 So.3d 231, 244 n.13.

---

Appeal, Rules 2-1 – 2-1.17. See also **Bezet v. Original Library Joe's, Inc.**, 2001-1586 (La. App. 1st Cir. 6/21/02), 835 So.2d 472, 475.

If the court finds that the State has met its burden of proving one of the grounds for termination by clear and convincing evidence, the court must then determine whether termination is in the best interests of the children. La. Ch. Code art. 1039; **State in Interest of A.L.D.**, 263 So.3d at 863. To summarize, involuntary termination of parental rights is a two-pronged inquiry. First, the State must prove by clear and convincing evidence the existence of at least one of the eight statutory grounds for termination under La. Ch. Code art. 1015. Second, after the ground for termination is found, the court must determine whether the termination is in the child's best interests. La. Ch. Code art. 1039; **State ex rel. L.B. v. G.B.B.**, 2002-1715 (La. 12/4/02), 831 So.2d 918, 922.

These factually-intense determinations are reviewed on appeal under the manifest error standard. **State ex rel. H.A.B.**, 2010-1111 (La. 10/19/10), 49 So.3d 345, 368; **State in Interest of A.D.**, 2020-1298 (La. App. 1st Cir. 6/4/21), 327 So.3d 1032, 1034. The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. **Zito v. Advanced Emergency Medical Services, Inc.**, 2011-2382 (La. 5/8/12), 89 So.3d 372, 375 (citing **Stobart v. State, Dep't of Transp. and Dev.**, 617 So.2d 880, 882 (La. 1993)). If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. **Zito**, 89 So.3d at 375 (citing **Stobart**, 617 So.2d at 882-83).

In this case, the juvenile court found that DCFS proved two statutory grounds for terminating L.F.'s parental rights—abandonment for failure to make child contribution payments for any period of six consecutive months under La. Ch. Code art. 1015(5)(b)[21] and failure to substantially comply with the case plan under La. Ch.

---

[21] After its amendment by 2023 La. Acts No. 271, § 1 (eff. June 9, 2023), this ground is now set forth in La. Ch. Code art. 1015(4)(b); the substance of this subsection of the statute has not changed. See FN 15, *supra*.

Code art. 1015(6).[22] Louisiana Children's Code article 1015(5)(b)[23] provides for termination on the basis of:

> (5) Abandonment of the child[ren] by placing [them] in the physical custody of a nonparent, or the [custody of the state], or by otherwise leaving [them] under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> * * *
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child[ren]'s care and support for any period of six consecutive months.

To prove abandonment on the basis of failing to provide significant contributions to the children's care and support, DCFS need not prove that the parent voluntarily placed the children in state custody. **State ex rel. A.T.W.**, 2009-2274 (La. App. 1st Cir. 3/26/10), 2010 WL 1170262, *2 (unpublished). Rather, abandonment may be proven by establishing that the parent left the children under circumstances demonstrating an intention to permanently avoid parental responsibility by failing to provide significant contributions to the children's care and support for any consecutive six-month period. **Id.**

Louisiana Children's Code article 1015(6)[24] provides for termination on the basis of:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

---

[22] After its amendment by 2023 La. Acts No. 271, § 1 (eff. June 9, 2023), this ground is now set forth in La. Ch. Code art. 1015(5); the substance of this subsection of the statute has not changed. See FN 16, *supra*.

[23] See FNs 15 and 21, *supra*.

[24] See FNs 16 and 22, *supra*.

Louisiana Children's Code article 1036(C) provides that lack of parental compliance with a case plan under La. Ch. Code art. 1015(6) may be evidenced by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.
>
> (8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.
>
> (b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

Furthermore, La. Ch. Code art. 1036(D) provides that lack of any reasonable expectation of significant improvement in the parent's conduct in the near future under La. Ch. Code art. 1015(6) may be evidenced by one or more of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

19

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

After carefully reviewing the record, we agree with the juvenile court that DCFS proved the statutory grounds for terminating L.F.'s parental rights under La. Ch. Code art. 1015(5)(b) for abandonment on the basis of failing to provide significant contributions to the children's care and support for any period of six consecutive months, and under La. Ch. Code art. 1015(6) for her failure to substantially comply with the case plans and there being "no reasonable expectation of significant improvement" in L.F.'s condition or conduct in the near future. DCFS presented clear and convincing evidence that despite L.F. having had over a year and a half since DCFS first presented her with a case plan to maintain custody of the children and accomplish the case plan goals, there has been a lack of substantial compliance under each of the elements listed in La. Ch. Code art. 1036(C). In addition, DCFS presented evidence of "an established pattern of behavior" that indicates that there is "no reasonable expectation of significant improvement in the parent's condition or conduct in the near future." See La. Ch. Code art. 1036(D) and La. Ch. Code art. 1015(5)(b).

However, proof of any of the statutory grounds for termination of parental rights under La. Ch. Code art. 1015 does not give rise to a presumption that termination is in the child's best interests. **State in Int. of T.M.P.**, 2013-1006 (La. App. 4th Cir. 10/23/13), 126 So.3d 741, 758. After a statutory ground for termination under La. Ch. Code art. 1015 is found, the court must determine whether termination is in the child's best interests. **State ex rel. L.B.**, 831 So.2d at 926; **State in Int. of**

20

**C.A.C.**, 2011-1315 (La. App. 4th Cir. 2/1/12), 85 So.3d 142, 147, <u>writ denied</u>, 2012-0388 (La. 3/7/12), 83 So.3d 1048. The law poses the best interest determination as a separate consideration and envisions examination of any special conditions or exceptional circumstances that may exist. **State in Interest of A.B.,** ___ So.3d at ___, 2024 WL 205495 at *6; **State in Interest of D.G. v. Danny G.,** 30,196 (La. App. 2nd Cir. 10/29/97), 702 So.2d 43, 45.

In this matter, the record before us contains facts that support a finding that the juvenile court did not err in granting DCFS's petition to terminate parental rights and certify the children for adoption. The evidence shows that the children have been in the care of relatives—their paternal grandparents—since May 27, 2022 and that the children have bonded with the grandparents. The paternal grandparents have become certified and agree to adopt the children if the rights of the parents are terminated.

The DCFS caseworker and CASA volunteer testified about the children's progress in their grandparents' home as well as the efforts the grandparents have made to ensure that the children have flourished. In its oral reasons, the juvenile court stated that the need for permanence in these children factored into its termination ruling. The juvenile court found that the best interests of the children were served by permanence and stability, which was best achieved by remaining in their grandparents' home in which the children had been thriving. The juvenile court noted the children had established bonds with their grandparents and had considered the danger of removal to the health and well-being of each child. In its written reasons, the juvenile court indicated that the children needed the stability that adoption provides.

Given the children's young ages (S.F. is five years old; R.B. is two years old), the fact that they have spent much of their lives with their paternal grandparents, and L.F.'s lack of interest in and/or her ability to comply with her case plans, it is in the

21

children's best interest to terminate L.F.'s parental rights so that the children may be adopted by their paternal grandparents, who have provided them with a "safe, stable, and permanent home" since May 27, 2022. See La. Ch. Code art. 1015(5)(b). We find that the evidence supports the juvenile court's finding that DCFS proved by clear and convincing evidence that the parental rights of L.F. to her children S.F. and R.B. should be terminated, and that termination of L.F.'s parental rights is in the best interest of the children. Thus, we affirm the judgment of the juvenile court.

## DECREE

Based on the foregoing, we affirm the juvenile court's August 9, 2023 judgment. All costs of this appeal are assessed to the appellant, L.F.

**AFFIRMED.**